RANDY S. GROSSMAN
United States Attorney
Joseph S. Green
Assistant United States Attorney
California Bar No. 251169
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: 619-564-6955
joseph.green@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 97CR2520-LAB |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)** |
| v. | |
| BENJAMIN ARELLANO-FELIX, | |
| Defendant. | |

**Introduction**

Defendant Benjamin Arellano-Felix has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A), and order his release based on the threat posed by the COVID-19 pandemic and other considerations. The Court should deny the motion for two reasons. First, no "extraordinary and compelling" reasons under § 3582(c)(1)(A) justify the extraordinary relief of a sentence reduction. Defendant is fully vaccinated against COVID-19, including having received a booster shot, and he has not shown that COVID-19 presents a particular risk to him that warrants his release. Second, the 18 U.S.C. § 3553(a) factors counsel strongly against release because Defendant was the overall leader of the Arellano-Felix Organization, aka Tijuana Cartel, one of Mexico's most violent drug cartels. The reduction of Defendant's sentence would not reflect the seriousness of Defendant's crimes, promote respect for the law, and provide just punishment for the offenses. Defendant's early release would also undermine the goal of protecting the public from Defendant's violent criminal conduct.

**Factual Background**

On April 2, 2012, Defendant was convicted of conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 USC 1962(c), and conspiracy to launder monetary instruments, in violation of 18 USC 371. This Court sentenced Defendant to a total of 300 months of imprisonment. Defendant has served approximately eleven years of that sentence. He is currently incarcerated at Lee United States Penitentiary and is scheduled to be released on April 28, 2033.

**I.  BOP's response to the COVID-19 pandemic.**

The BOP has made COVID-19 vaccines universally available and has offered vaccination and booster shots to every employee and inmate in every BOP institution. As of June 22, 2022, BOP reports that 359,874 total doses of the vaccine have been distributed within its facilities, and 321,834 doses have been administered. Due to the scale of the national government's response to the COVID-19 pandemic, and the logistical feat of BOP's vaccination program, nearly all BOP institutions now report zero or just a handful of active inmate infections. Although the coronavirus has not been eradicated, the overall picture of the BOP is far different than the one seen one year ago. Vaccination information with respect to individual BOP institutions and the agency overall continues to be published in the BOP's Coronavirus Webpage at https://www.bop.gov/coronavirus/ (updated daily).

As a result of universal access to vaccines and overall declining infection rates within BOP institutions and in the community, BOP now assigns three different operational levels (Level 1, Level 2, and Level 3) to its facilities, depending on the facility's COVID-19 medical isolation rate, vaccination rate, and county transmission rate. A Level 1 facility will have minimal modifications to its operations. A Level 2 facility will have moderate modifications to its operations. And a Level 3 facility will have intense modifications to its operations, which generally means it will continue to adhere to the full COVID-19 Pandemic Plan that the BOP previously had in place. Defendant's facility is currently classified as a Level 3 facility and reports zero inmates who are positive for COVID-19.

Regardless of the operational level, however, all facilities will follow certain operational modifications to protect its inmates. For example, inmates who are not fully vaccinated, or had a known or suspected exposure to a case of COVID-19, must still complete a 10-day quarantine when they first enter the BOP. When BOP transfers inmates from one location to another, a 10-day quarantine may still be required, depending on the sending institution's operational level. In addition, vaccinated inmates will continue to be tested for COVID-19 following exposure to the virus or if they develop any symptoms. Finally, all BOP staff and inmates will be required to wear face coverings in indoor environments regardless of the person's vaccination status.

## II. Defendant's conviction and request for sentence reduction.

From 1986 to 2002, Defendant was the overall leader of the Arellano-Felix Organization, one of the most violent drug cartels in the world. Defendant supervised a team of top lieutenants, who are also now mostly in custody for their participation in the cartel's criminal activity. Defendant oversaw the importation of hundreds of tons of cocaine and marijuana into the United States. At his direction, members of the AFO kidnapped and murdered numerous individuals in furtherance of the cartel. Defendant also oversaw the payment of bribes to Mexican law enforcement and military officials.

Defendant was arrested in Mexico in 2002. Defendant was extradited to the United States in 2011. Following his extradition to the United States, Defendant pled guilty to conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(c), and conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 371. Defendant appeared for sentencing in April 2012, at which time the court sentenced him to the maximum possible penalty of a combined sentence of 25 years.

Defendant is approximately 68 years old and is housed at USP Lee, a high security penitentiary. According to medical records, Defendant received his first Covid-19 vaccine

on February 11, 2021, and his second shot on March 2, 2011. Defendant received a Covid-19 booster shot on March 3, 2022.

On April 25, 2022, Defendant filed a motion with this Court seeking a sentence reduction on the grounds that he might recontract Covid-19 and that he has served a "sufficient" amount of time in custody for his offenses.

## Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in extraordinary circumstances, grant a motion to reduce a defendant's sentence. This motion may be brought by the BOP Director or by a defendant directly. Before a defendant may file a motion for sentence reduction, however, he must first request that the BOP file such a motion on his behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in section 3553(a)" if the Court finds that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

In the most recent Guidelines Manual, the Sentencing Commission issued a policy statement for reductions of sentences under § 3582(c)(1)(A). It provides that a court may reduce a sentence after considering the § 3553(a) factors if it finds that (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an application note defining the criteria that qualify as "extraordinary and compelling." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Third, age may qualify if the defendant (1) is at least 65 years old; (2) is experiencing "a serious deterioration in physical or mental health because of the aging process"; and (3) has served at least 10 years or 75% of the sentence, whichever is less. U.S.S.G. § 1B1.13, cmt. n.1(B). Fourth, certain family circumstances may be extraordinary and compelling. U.S.S.G. § 1B1.13, cmt. n.1(C). Lastly, in a broad "catch-all" provision, the application note recognizes the possibility that the BOP Director could identify an extraordinary and compelling reason "other than, or in combination with, the reasons described" above. U.S.S.G. § 1B1.13, cmt. n.1(D).

### Discussion

This Court should deny Defendant's motion because he does not identify "extraordinary and compelling reasons" justifying the dramatic relief of a sentence reduction. Defendant does not have "a serious physical or medical condition" within the meaning of the Sentencing Commission's policy statement. Nor does Defendant present any reason that clears the high and "extraordinary" bar established by Congress in § 3582(c)(1)(A). Defendant also does not satisfy his burden to show that release is warranted

under the § 3553(a) factors, including the need to protect the public and satisfy other penological goals.[1]

**I.   Defendant does not meet the threshold requirement of having "extraordinary and compelling reasons" required for relief under the statute.**

Under 18 U.S.C. § 3582(c)(1)(A), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement defines "extraordinary and compelling" to include specific categories of medical conditions and other circumstances. U.S.S.G. § 1B1.13, cmt. n.1(A). Yet Defendant offers none of these circumstances in the motion.

**A.   After *Aruda*, this Court is not strictly bound by the Sentencing Commission's current policy statement, but it still serves as an important framework for the Court's exercise of discretion.**

The Ninth Circuit has held that the policy statement in U.S.S.G. § 1B1.13 is not binding. *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (per curiam). Under *Aruda*'s rationale, § 1B1.13 is technically not "applicable" within the meaning of § 3582(c)(1)(A), because it was issued when only the BOP Director could file motions for compassionate release, before the First Step Act opened up the process to inmates. *Id.* at 800–802. *Aruda* did not express qualms about the *substance* of § 1B1.13, however. Nor did the Ninth Circuit question the Sentencing Commission's standing as the resident expert on this subject. See 28 U.S.C. § 994(t) (instructing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").

Far from criticizing the wisdom of the existing policy, *Aruda*'s holding was a product of the Sentencing Commission's inability to update § 1B1.13 due to its current lack of a quorum. *Aruda*, 993 F.3d at 800 n.1 This Court should therefore resist Defendant's invitation to "invent [its] own policies about compassionate release." *United States v. Gunn*,

---

[1] Defendant met the statutory exhaustion requirement because he filed this motion after "the lapse of 30 days" from the date of his request to the warden. 18 U.S.C. § 3582(c)(1)(A).

980 F.3d 1178, 1180 (7th Cir. 2020) (Easterbrook, J.). That would be inconsistent with Congressional design. As the Ninth Circuit and its sister circuits have emphasized, § 1B1.13 continues to "inform a district court's discretion[.]" *Aruda*, 993 F.3d at 802. Because it remains "a working definition of 'extraordinary and compelling reasons[,]' a [court] who strikes off on a different path risks" abusing its discretion. *Gunn*, at 1180.

Accordingly, the Court's analysis of whether an inmate's reasons are truly extraordinary and compelling should begin with the Sentencing Commission's current policy statement. Although the Court is not limited by the policy statement, and has the freedom to consider additional factors, its discretion should still hover close to § 1B1.13. The following reasons explain why.

*First*, the history of § 1B1.13 shows that the Commission drafted the current policy statement to maximize clarity on what "extraordinary and compelling" means. In 2016, it "conducted an in-depth review" of compassionate release, in response to criticism by the Office of Inspector General about BOP's "low approval rates" and inadequate "implementation of its compassionate release program." U.S.S.G. Appx. C, Amend. 799; see *United States v. Brooker*, 976 F.3d 228, 231–32 (2d Cir. 2020) (describing criticism). As part of its searching review, the Commission heard testimony from witnesses and experts about the need to remove the hurdles that limit compassionate release for worthy inmates. U.S.S.G. Appx. C, Amend. 799. In the end, the Commission did precisely that, issuing a new policy that "broadens" the eligibility criteria and "encourages" the BOP Director to initiate motions using the new standard as its guide. *Id.*

Section 1B1.13's goals of expanding compassionate release and crystalizing guidance means the policy statement is well-suited for use after the First Step Act, which similarly sought to "increase[e] the use and transparency of compassionate release." Pub. L. No. 115-391 § 603(b), December 21, 2018. That the Commission "made a direct plea to the BOP" to ramp up compassionate release engenders confidence that its policy was meant to be as clear and comprehensive as possible. *Bryant*, 996 F.3d at 1250.

*Second*, abandoning § 1B1.13 risks reverting federal sentencing back to an era of indeterminate sentencing that was broadly repudiated by the Sentencing Reform Act in 1984. For nearly a century, rehabilitation was the primary objective of sentencing—to that end, district courts exercised "nearly unfettered discretion" to choose a sentence while parole officers had "almost absolute discretion" to decide when an offender should be released. *Mistretta*, 488 U.S. at 363–65. The system was ultimately discarded because it produced two "unjustified" and "shameful" consequences. *Id.* at 366 (quoting S. Rep. No. 98-225 at 38 and 65 (1983)). The first was "the great variation among sentences imposed by different judges upon similarly situated offenders." *Id.* The second was that nobody could be certain "as to the time the offender would spend in prison." *Id.* "Each was a serious impediment to an evenhanded and effective operation of the criminal justice system." *Id.* These outcomes were also viewed as contributing to growing prison unrest and unjustifiably lenient treatment of serious offenders during a period of rising crime. K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 30–31 (1998).

Against this backdrop, Congress passed the Sentencing Reform Act to abolish the parole system, create the Sentencing Commission, and generally "channel[] judges' discretion" in matters relating to sentencing. *Tapia v. United States*, 564 U.S. 319, 325 (2011). In so doing, Congress aspired to "develop a system of sentencing whereby the offender, the victim, and society all know the prison release date at the time of the initial sentencing by the court, subject to minor adjustments based on prison behavior called 'good time.'" S. Rep. No. 98-225 at 46 (1983). It sought nothing less than to create a "fair" system for both offenders and the public, to "retain the confidence of American society," and to ensure "an effective deterrent against crime." *Id.* at 49–50.

The Court's discretion should account for this history—not least because the Sentencing Reform Act enacted the modern compassionate release statute in 18 U.S.C. § 3582(c)(1)(A). Pub. L. No. 98-473, October 12, 1984. Compassionate release was not meant to preserve parole, nor was the First Step Act passed to resuscitate it. Because § 1B1.13 continues to be an appropriate framework for determining release eligibility, the Court

should "channel" its discretion through it. Otherwise, compassionate release "would return us to the pre-SRA world of disparity and uncertainty." *Bryant*, 996 F.3d at 1257.

*Third*, while it is apparent that Congress in the First Step Act endeavored to release some deserving prisoners serving long sentences,[2] compassionate release was not the solution it chose. Instead, Congress devised a calibrated and cautious, not wholesale, approach. The Act directed the BOP to develop an intricate "risk and needs assessment system" that assigns prisoners to "evidence-based recidivism reduction programming" or other "productive activities," with the goal of lowering their recidivism rating. P.L. No. 115-391 § 101; see 18 U.S.C. § 3632. Under this system, prisoners receive rewards for successful participation in these programs, the most prominent of which is the receipt of time credits that—on top of "good time" credits under § 3624(b)—grant successful prisoners even earlier release from incarceration, to some form of "prerelease custody" or straight to supervised release. P.L. No. 115-391 §§ 101–102; see 18 U.S.C. §§ 3632 and 3624.

The bill's main sponsors confirm that the new BOP system was a centerpiece of Congress' plan to incrementally reduce the U.S. prison population—but early release had to be *earned*. See 164 CONG. REC. S7744 (statement of Sen. Durbin) ("We spell out exactly what we are looking for: the most effective and efficient, evidence-based recidivism-reduction programs. . . . You are either going to do this in good faith, positively, without any violations of your responsibilities as a Federal prisoner—we will give you a chance for less time but no nonsense"); 164 CONG. REC. S7642 (statement of Sen. Cornyn) ("The goal of this bill is not to release broad swaths of criminals—in fact, it is just the opposite. This legislation allows prisons to help criminals transform their lives, if they are willing to take the steps and responsibility to do so"). Because Congress carefully crafted this system, the Court should be skeptical about claims allowing prisoners to skip over it.

*Fourth*, hewing close to the existing policy statement is the soundest way to bridge the gap until the Guidelines Manual is updated. Resort to § 1B1.13 has proved appropriate during the coronavirus pandemic. Applying its criteria, judges in this district have properly

---

[2] See 164 CONG. REC. S7737–7822 (December 18, 2018) and H10346–10366 (December 20, 2018).

9

released scores of prisoners vulnerable to COVID-19 illness, while appropriately denying release to many others who are not as vulnerable. For a motion that does not assert any grounds covered by the policy statement, this Court retains "full discretion" to decide that it simply does not rise to such a "rare" occasion that it would meet the exacting bar established by Congress in § 3582(c)(1)(A). *Jones*, 980 F.3d at 1109; *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring). After all, "extraordinary" means "*exceptional* to a very marked extent," and "compelling" means "to cause to do or occur by *overwhelming* pressure." Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphases added). "Put another way, the district court must find that the defendant's situation constitutes the type of 'extreme hardship' that the compassionate-release statute is designed to ameliorate." *United States v. Saccoccia*, 10 F.4th 1, 4 (1st Cir. 2021). Few cases actually meet this standard.

*Fifth*, finality is "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989). While the principle of finality must give way when truly "extraordinary and compelling" cases arise, unguided releases threaten finality in ways that are harmful to society and the offender. Society's goal of deterring crime "depends upon the expectation that one violating the law will swiftly and *certainly* become subject to punishment[.]" *Engle v. Isaac*, 456 U.S. 107, 127 n.32 (1982) (emphasis added; internal quotations omitted). Rehabilitation "demands that the convicted defendant realize that he is justly subject to sanction[.]" *Id* (internal quotations omitted). Opening compassionate release to any reason shifts the offender's focus away from serving just punishment, and towards the myriad possibilities for how he or she can avoid that service. For this reason as well, the Court's discretion should lean on the factors in § 1B1.13.

*Sixth*, the plurality of federal circuits—including those that recognize § 1B1.13 is *not* binding—have drawn clear boundaries around the reasons that qualify inmates for compassionate release. The Third, Sixth, Seventh, and Eighth Circuits have held that non-retroactive changes in the First Step Act, whether singularly *or in combination with other reasons*, cannot serve as a basis for release because that would undermine Congress's clear

effort to limit the retroactivity of the FSA's reforms. *United States v. Andrews*, 12 F.4th 255, 261 (3d Cir. 2021); *United States v. Jarvis*, 999 F.3d 442, 444 (6th Cir. 2021); *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021); *United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022). These authorities speak with one voice: inmates who received longer mandatory sentences before the FSA may not reduce their sentences on the ground that the Act now requires shorter mandatory sentences for defendants sentenced today.

*Finally*, defendants sentenced after the FSA, but before the Ninth Circuit's decision in *United States v. Lopez*, 998 F.3d 431, 444 (9th Cir. 2021) (interpreting safety valve factors in 18 U.S.C. § 3553(f)(1) as conjunctive requirements), are not eligible based on the *Lopez* decision, either. Assuming *Lopez* remains good law down the line,[3] inmates sentenced prior to *Lopez* under a disjunctive reading of the safety valve framework may claim they were sentenced under an erroneous application of the statute. But "a claim of errors in the original sentencing is not itself an extraordinary and compelling reason for release[.]" *United States v. Martin*, 21 F.4th 944, 946 (7th Cir. 2021). Other specific federal statutes already offer relief for sentencing errors—including the appeals statute in 18 U.S.C. § 3742 and the habeas statute in 28 U.S.C. § 2255. As the Sixth and Seventh Circuits have recognized, the general compassionate release statute may not be construed to circumvent specific, existing statutes. *United States v. Hunter*, 12 F.4th 555, 567 (6th Cir. 2021) (Congress did not "intend[] to allow prisoners to avoid the specific habeas restrictions by resorting to compassionate release"); *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021) (compassionate release should not be read to "create[] tension with the principal path and conditions Congress established for federal prisoners to challenge their sentences"). "If the sentencing court mistakenly [sentenced the defendant], then [his] recourse was to pursue a direct appeal or a motion for post-conviction relief under 28 U.S.C. § 2255." *Crandall*, 25 F.4th at 586. A defendant "cannot avoid the restrictions of the post-conviction relief statute by resorting to a request for compassionate release instead." *Id.* Because the "duration of a lawfully imposed sentence does not create an extraordinary or compelling circumstance,"

---

[3] The United States has petitioned the Ninth Circuit to grant *en banc* review of the *Lopez* decision.

*Andrews*, 12 F.4th at 260–61, to the extent a defendant was lawfully but erroneously sentenced under *Lopez*, § 3582(c)(1)(A) does not provide the relief he desires.

      B.      Defendant does not have the "extraordinary and compelling reasons" required by 18 U.S.C. § 3582(c)(1)(A).

Courts routinely recognize that even despite the threat from COVID-19, "compassionate release is 'rare' and 'extraordinary;' [and] the current national emergency does not change this." *United States v. Arceo*, No. 9CR616, 2020 WL 2614873 at *2 (N.D. Cal. May 22, 2020); see *United States v. Smeltzer*, No. 18CR4562-JAH, 2020 WL 2797493 at *1 (S.D. Cal. May 29, 2020) ("18 U.S.C. § 3582(c)(1)(A) sets forth a rare exception to the general rule" that courts may not modify final sentence).

Defendant cannot meet the high bar of demonstrating he has extraordinary and compelling reasons. No evidence shows that Defendant has "a serious physical or medical condition" that "substantially diminishes" his ability to "provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Because COVID-19 vaccine access is available to every inmate in the BOP, Defendant's risk is mitigated by that alone. See, e.g., *United States v. Davis*, No. 19-949, 2021 WL 1382119 at *2 (D.N.J. April 12, 2021) ("As vaccine access expands to inmates at FDC Philadelphia, the risk that Davis will contract a serious case of COVID-19 continues to decrease"); *United States v. Minnis*, No. 19CR 20182, 2021 WL 1550429 at *4 (S.D. Florida April 19, 2021) ("[g]iven such wide-spread vaccine distribution in Defendant's facility . . . early release is no longer the correct answer").

According to the CDC, "[n]early half of adults in the United States (108 million, or 45%) have hypertension[,]" or elevated blood pressure.[4] In other words, it is a common and chronic condition that nearly 50% of the American population lives with on a daily basis. Previously, the CDC published guidance stating that hypertension "might" increase a

---

[4] See CDC, Facts About Hypertension, available at: https://www.cdc.gov/bloodpressure/facts.htm (last visited April 19, 2021).

12

person's risk of serious illness from COVID-19.[5] In revised guidance published on March 29, 2021, the CDC provided a similarly inconclusive risk assessment, saying that hypertension can "possibly" make a person severely ill from COVID-19.[6] Due to the prevalence of hypertension in the U.S. population, and the sustained uncertainty of the scientific evidence about its risk to people with COVID-19, it is not an "extraordinary and compelling reason" that makes an inmate eligible for compassionate release.

Consequently, many courts regard hypertension as one of the many types of "[c]hronic conditions that can be managed in prison [and] are not a sufficient basis for compassionate release." *United States v. Hayden,* No. 11CR393, 2020 WL 4674108 at *2 (D. Oregon August 11, 2020); *United States v. Ballenger*, No. CR16-5535, 2020 WL 3488157 at *5 (W.D. Wash. June 26, 2020) (same); *United States v. Luck*, No. 12CR888, 2020 WL 3050762 at *2 (N.D. Cal. June 8, 2020) (same).

This Court has taken a similar approach, concluding that hypertension "fails to persuade the Court that [it] qualif[ies] as 'extraordinary and compelling'"[.] *United States v. Ocon*, No. 13CR2530-JAH, 2020 WL 5106667 at *3 (S.D. Cal. August 31, 2020) (denying compassionate release to 50 year-old inmate with asthma, hypertension, hepatitis C, and mental health conditions); see *United States v. Acuna Gonzalez,* No. 17CR2970-H, 2020 WL 4732057 at *4 (S.D. Cal. August 14, 2020) (marking "distinction between hypertension and pulmonary hypertension"); *United States v. Vignoni*, No. 17CR1352-W (S.D. Cal. January 29, 2021) (Dkt. No. 57) ("Ordinary hypertension (high blood pressure) is not one of the conditions identified by the CDC as increasing a person's risk for developing serious illness from COVID-19").[7]

---

[5] See CDC Press Release: CDC updates, expands list of people at risk of severe COVID-19 illness, available at: https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html (dated June 25, 2020).

[6] See CDC, People with Certain Medical Conditions, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated March 29, 2021).

[7] See also *United States v. Carter,* No. CR107-76, 2020 WL 4194014 at *2 (S.D. Ga. July 21, 2020) (hypertension "is well-controlled by medication"); *United States v. Tartaglione*, No. 15-491, 2020 WL 3969778 at *6 (E.D. Penn. July 14, 2020) (64 year old inmate with hypertension and other conditions "do

Moreover, BOP's medical records show that Defendant has not suffered from acute episodes because of this condition. The records also show that Defendant's hypertension is being professionally managed by BOP with prescription medication and that he is being well cared for.

Nor does Defendant's age advance his argument. As Judge Rakoff observed about older inmates during the pandemic: "if [a defendant's] age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress." *United States v. Haney*, __ F. Supp.3d __, 2020 WL 1821988 at *5 (S.D.N.Y. April 13, 2020); see, e.g., *United States v. Hiller*, No. ELH-18-389, 2020 WL 2041673 at *4 (D. Maryland April 28, 2020) (denying compassionate release to inmate over 65 who claimed risk of infection); see *United States v. Partida*, No. CR-17-8260, 2020 WL 3050705 at *5 (D. Ariz. June 8, 2020) (denying relief to 60 year old inmate with no serious medical conditions); *United States v. Singh*, No. 17CR210, 2020 WL 1937437 at *2 (E.D. Cal. April 22, 2020) (denying relief to 62 year old prisoner with no serious health ailments).

Finally, Defendant does not have an "extraordinary and compelling" reason qualifying him for compassionate release because he has been fully vaccinated against the virus. As Judge Easterbrook of the Seventh Circuit recently observed, "for the vast majority

---

not present the kind of particularized vulnerability to COVID-19 needed to justify compassionate release"); *United States v. Hernandez,* No. 17CR264, 2020 WL 5203428 at *3 (E.D. Cal. September 1, 2020 ("hypertension does not *per se* put him at an increased risk"); *United States v. Battis,* No. 15CR429, 2020 WL 5094844 at *1 (M.D. Florida August 28, 2020) ("Both hypertension and obesity, if treatable and controlled, have been found insufficient to justify compassionate release"); *United States v. McKinnie*, No. 16CR304, 2020 WL 5087058 at *2 (N.D. Ohio August 27, 2020) (despite defendant's claims "many courts have found just the opposite—hypertension and obesity, in combination with COVID-19, do not constitute extraordinary and compelling reasons for compassionate release"); *United States v. Nash*, No. CR12-23, 2020 WL 4758260 at *3 (W.D. Wash. August 17, 2020) ("courts have declined to grant compassionate release based on a diagnosis of hypertension where no other high-risk medical conditions are present"); *United States v. Billings*, No. 19CR99, 2020 WL 4705285 at *5 (D. Colo. August 13, 2020) ("nothing in the record to indicate his hypertension is not controlled with adherence to his prescribed medical regimen").

of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release." *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021). Stated differently, "for the many prisoners who seek release based on the special risks created by COVID-19 for people living in close quarters, vaccines offer relief far more effective than a judicial order"—especially when the known scientific evidence demonstrates that "[v]accinated prisoners are not at greater risk of COVID-19 than other vaccinated persons" who are living in the community. *Id.* at 802–803. Simply put, "a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction. *United States v. Lemons*, __ F.4th __, 2021 WL 4699249 at *3 (6th Cir. October 8, 2021).

The CDC's guidance assures that "COVID-19 vaccines are effective against severe disease and death from variants of the virus that causes COVID-19 currently circulating in the United States, including the Delta variant." CDC, When You've Been Fully Vaccinated, available at: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (updated October 15, 2021). Moreover, "[c]urrent vaccines are expected to protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant," even though breakthrough infections in people who are fully vaccinated are likely to occur. CDC, Omicron Variant: What You Need to Know, available at: https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (updated December 20, 2021). According to the CDC, vaccines remain "highly effective" at preventing severe illness and death. *Id.*

Importantly, in its detailed study of Delta and Omicron transmission in the United States between August 2021 and January 2022, the CDC has concluded that COVID-19 booster shots have been "highly effective" at preventing hospitalizations associated with both strains of the virus (94% for Delta and 90% for Omicron). CDC, Morbidity and Mortality Weekly Report, available at:

https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e3.htm?s_cid=mm7104e3_x (dated January 21, 2022). All BOP facilities offer booster shots to staff and inmates.

Accordingly, this Court recognizes "the growing scientific research that vaccinations are largely successful at warding off the coronavirus." *United States v. Wang*, No. 19CR1895-BAS (S.D. Cal. April 6, 2020) (Dkt. No. 111). This Court "agrees with other district courts that Defendant's 'vaccination significantly mitigates the risk that [he] will contract COVID-19,' much less become seriously ill." *United States v. Del Rosario Martinez*, 524 F. Supp.3d 1062, 1066 (S.D. Cal. 2021) (collecting cases). In fact, this Court has held that receiving even a partial dose of the vaccine eliminates the conditions that would otherwise qualify an inmate for compassionate release. In *United States v. Cervantes*, 17CR1257-JLS (S.D. Cal. April 16, 2021) (Dkt. No. 98), this Court held that a defendant with "serious medical concerns" could not establish "extraordinary and compelling reasons" for a sentence reduction, because after receiving at least one dose of the Moderna vaccine (and in the context of the increasing availability of vaccines within the BOP), "the institutional risk factor associated with the virus' transmission is not nearly as significant as it was earlier in the pandemic."

Defendant is fortunate to have received a vaccine that public health officials assure will significantly mitigate the risk of serious illness from COVID-19. It would be anomalous indeed for Defendant to receive the twin benefit of vaccination *and* release from prison. Therefore, despite his underlying health conditions, this Court should conclude—as it has in similar cases—that his "chances of reinfection or relapse have been largely dissipated by [the] vaccination." *United States v. Henderson*, No. 14CR307-BAS (S.D. Cal. January 27, 2021) (Dkt. No. 74) (morbidly obese inmate with asthma cannot show "extraordinary and compelling" reasons after being vaccinated). "Although Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19." *United States v. Grummer*, No. 8CR4402-DMS (S.D. Cal. February 16, 2021) (Dkt. No. 132) (denying compassionate release to 55 year old inmate with chronic heart disease, hypertension, and asthma); see *United States v. Del Villar*, No. 12CR2416-

16

WQH (S.D. Cal. May 13, 2021) (Dkt. No. 257) ("Defendant's medical conditions have been adequately addressed by the Bureau of Prisons, including receiving the vaccination to protect against COVID-19"); *United States v. Cobarruvias-Pete*, No. 18CR4151-CAB (S.D. Cal. October 15, 2021) (Dkt. No. 33) ("Courts are consistently refusing to grant release from custody to inmates or detainees who have been vaccinated"); see also *United States v. Smith*, No. 17CR20753, 2021 WL 364636 at *2 (E.D. Mich. February 3, 2021) ("absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling'").

It is possible that the scientific consensus may shift if vaccine-resistant variants emerge or the vaccines prove less effective than studies to date suggest. If those possibilities materialize, Defendant can file another motion for compassionate release. At this time, however, this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare the risk of severe disease from COVID-19. As inmates are vaccinated throughout BOP, this unprecedented period, in which the threat of the virus sometimes gives rise to "extraordinary and compelling" circumstances, should end.

In fact, research shows that the immunity built up by the combination of prior COVID infection and vaccination is particularly long-lasting. Recent studies now show that "[i]mmunity to the coronavirus lasts at least a year, possibility a lifetime, improving over time especially after vaccination," which may "help put to rest lingering fears that protection against the virus will be short-lived." Apoorva Mandavilli, *Immunity to the Coronavirus May Persist for Years, Scientists Find*, N.Y. Times, May 26, 2021, available at: https://www.nytimes.com/2021/05/26/health/coronavirus-immunity-vaccines.html. These studies found that after COVID-19 infection, memory B cells persist in the bone marrow and continue to mature and strengthen for at least 12 months after the initial infection, remaining available to "churn out" antibodies whenever needed. *Id.* According to Scott Hensley, an immunologist at the University of Pennsylvania, the research "is consistent with the growing body of literature that suggests that immunity elicited by infection and

vaccination for SAR-CoV-2 appears to be long-lived[.]" *Id.* In fact, according to Michel Nussenzweig, an immunologist at Rockefeller University, the memory B cells produced in response to both an infection and a vaccination are "so potent" that they thwart even variants of the virus, negating the need for booster shots. *Id.* Similarly, a peer-reviewed article published in Nature on June 28, 2021, found that vaccinated individuals who previously had COVID-19 "produced the most robust serologic responses." See Nature, SARS-CoV-2mRNA vaccines induce persistent human germinal centre responses, available at: https://www.nature.com/articles/s41586-021-03738-2_reference.pdf.

Because Defendant does not meet the heavy burden of demonstrating "extraordinary and compelling reasons," the Court should deny the motion on that basis alone.

## II. The factors under 18 U.S.C. § 3553(a) do not support release.

In addition, this Court must consider the 18 U.S.C. § 3553(a) factors in deciding whether a reduction in sentence is warranted. 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Even assuming Defendant could establish "extraordinary and compelling reasons" under Section 3582(c), the 3553(a) factors squarely weigh against Defendant's early release and his motion should, accordingly, be denied. *United States v. Keller*, 2021 WL 2695129, at *5 (9th Cir. 2021). Defendant has served less than half of his twenty-five-year sentence imposed by the court, and a reduction of Defendant's sentence is not supported by the 3553(a) factors.

The nature and circumstances of Defendant's offenses were of the utmost seriousness. Defendant ran an international drug cartel. As the leader of the organization, Defendant supervised the importation of tons of narcotics into the United States and directed countless kidnappings and murders in furtherance of the cartel.

Conversely, there is nothing in Defendant's history and characteristics that justify, excuse, or mitigate his egregious conduct. The need for deterrence also weighs against Defendant's early release. Because of his role, Defendant is one of the people that an

example should be made of to deter others from participating in these activities, and a reduction of Defendant's sentence would not reflect his role in the criminal activity.

Therefore, the Court should deny Defendant's motion based on the § 3553(a) factors, in addition to the absence of extraordinary and compelling reasons.

## Conclusion

For these reasons, this Court should deny Defendant's motion requesting compassionate release.

DATED: July 5, 2022                     Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

/s/ Joseph S. Green
Joseph S. Green
Assistant U.S. Attorney